OHIO STATE BAR ASSOCIATION *v.* STERN.

[Cite as *Ohio State Bar Assn. v. Stern,*
103 Ohio St.3d 491, 2004-Ohio-5464.]

(No. 2004–0106–Submitted May 25, 2004–Decided November 3, 2004.)

ALICE ROBIE RESNICK, J.

{¶ 1} Respondent, Stephen M. Stern, former Jefferson County Prosecuting Attorney, now of Leesburg, Florida, Attorney Registration No. 0001379, was admitted to the Ohio bar in 1973 and registered for inactive status on September 1, 2003. The sole disciplinary charge against him stems from his surreptitious videotaping of a meeting with two investigators from the Office of Disciplinary Counsel ("ODC") who were interviewing respondent regarding a grievance against him that was later found to be without merit. Early in that meeting, when asked by one of the investigators, respondent denied that any taping was occurring. For the reasons that follow, we dismiss the charge against respondent and reject the recommendation of the Board of Commissioners on Grievances and Discipline that respondent receive a public reprimand.

# I

## Background

{¶ 2} The report prepared by the panel of the board that heard the cause against respondent aptly observed that "[t]his case has a lengthy and somewhat tortured history." In reaching our conclusion, we focus only on those facts that are necessary to explain the reasons for our decision. We make no attempt to fully document every detail in the lengthy record that was developed and considered by the panel and the board. At the same time, there are still many aspects relevant to the charge that we must explore to explain our reasoning.

{¶ 3} In 2000, ODC was investigating allegations of unethical conduct lodged against respondent by a resident of Jefferson County, Mary Smith, who claimed that respondent, in his role as Jefferson County Prosecuting Attorney, was engaging in some type of vendetta against certain subjects of criminal inquiries, including the grievant and her husband, Gary Smith. Those allegations were never substantiated and did not themselves result in disciplinary charges against respondent. During ODC's investigation, two ODC investigators met with respondent on October 12, 2000, in respondent's office. Respondent directly answered "no" when specifically asked whether the meeting was being taped.

{¶ 4} ODC learned that the meeting had been videotaped when respondent's successor as county prosecutor, who defeated respondent in the November 2000 election, took over the office early in 2001, discovered the tape there, and ultimately gave it to his lawyer, who gave it to ODC. ODC filed a grievance against respondent based on the taping, and in early 2001, the Columbus Bar Association ("CBA") Grievance Committee was assigned to investigate the situation. The CBA Grievance Committee twice (in April 2002 and again in May 2002) voted not to file charges against respondent, and so dismissed the grievance.

{¶ 5} ODC appealed the dismissal, and the Ohio State Bar Association ("OSBA") Ethics Committee was designated to consider the appeal. Relator, OSBA, found that a formal complaint should be filed charging that respondent had violated DR 1–102(A)(4) (forbidding conduct involving dishonesty, fraud, deceit, or misrepresentation) and filed the complaint on October 7, 2002.[1]

{¶ 6} The matter was heard by the panel on August 25 and 26, 2003, and the panel made findings of fact, conclusions of law, and a recommendation. The Findings of Fact section of the panel's opinion detailed the circumstances surrounding the taping.

---

1. A charge that respondent failed to cooperate in the investigation against him was dismissed by the board upon recommendation of the panel and is not relevant to our consideration.

{¶ 7} Prior to the taping incident, respondent had suffered serious multiple head injuries in a bicycle accident that occurred in June 2000. There is extensive evidence in the record that respondent suffered from impairment of memory as a result of that accident and that he has been on numerous medications since that time. Furthermore, respondent testified to the panel that his injuries eventually resulted in his permanent and total disability.

{¶ 8} Respondent testified that he could not specifically remember whether he had taped the conversation and also could not recall the details of the taping. The videotape itself clearly establishes that the taping occurred and that respondent answered no when asked whether the meeting was being taped. Respondent has not relied on a position that his injuries impaired his judgment or memory so that no violation of DR 1–102(A)(4) occurred. Rather, he has argued throughout that, due to the circumstances surrounding the meeting with the ODC investigators, he was justified in making the tape and answering "no" to their inquiry.

{¶ 9} Respondent's principal defense has been that his actions regarding the taping in the specific circumstances were authorized under either a prosecuting-attorney exception or an extraordinary-circumstances exception to any generalized rule that such surreptitious recordings by attorneys are presumably unethical. Much of the consideration of respondent's position has been framed by Opinion No. 97–3, an advisory opinion issued by the board on June 13, 1997, which stated that surreptitious recording by an attorney generally would constitute an ethical violation in routine circumstances but that exceptions to that general rule are commonly recognized in certain specific situations.

{¶ 10} As support for his position that the taping and failure to disclose that the taping was occurring were justified, respondent presented numerous witnesses and supporting evidence regarding his prosecutorial investigations of the party who had filed a grievance against him, Mrs. Smith, and her husband. The Smiths were strong supporters of respondent's opponent in the November 2000 election for county prosecutor, which the opponent won. The panel found that the evidence it heard "clearly revealed" details of respondent's investigation into a business the Smiths were involved in, commonly referred to by its former name as the "Satralloy Plant." That investigation concerned hundreds of thousands of dollars in tax liability that had been inexplicably removed from the county auditor's books, as well as other issues. Respondent also was investigating the Smiths for allegedly illegally using municipal water from the village of Wintersville. In addition, the United States Environmental Protection Agency ("EPA") and Ohio Environmental Protection Agency were separately investigating the Smiths regarding several other concerns at the former Satralloy Plant, and respondent was at some level involved in those investigations.

{¶ 11} In light of these and other less extensively documented investigations involving the Smiths that were ongoing at the time of the meeting between respondent and the ODC investigators, the panel remarked that "it was clear that Respondent would have apprehension regarding any claims made to disciplinary counsel by the Smiths about any alleged wrongdoing on his part." Furthermore, the panel noted that respondent in the 1980s had been a target of an improper disciplinary investigation, in which "the office of disciplinary counsel had abused its authority."

{¶ 12} To further support the reasonableness of his position that the disciplinary investigation of him instigated by the Smiths was meant to impede his prosecutorial investigation of them, respondent presented the testimony of a former assistant prosecutor who is now a judge in Harrison County, who related how Mr. Smith had approached him and asked if he had any "dirt" that could be used against respondent.

{¶ 13} In closing the Findings of Fact section of its report, the panel wrote that "it appears the Smiths were manipulating the office of disciplinary counsel in an effort to curtail the Respondent's investigation activities by raising some form of vague alleged acts of misconduct on the part of Respondent."

{¶ 14} In the Conclusions of Law section of its report, the panel determined that, in view of the ongoing investigation of the Smiths and the previous improper conduct against him by then Disciplinary Counsel in the 1980s, respondent was justified in taping the conversation with ODC investigators and had an "understand[able]" belief that "the office of disciplinary counsel was being manipulated by the Smiths."

{¶ 15} Specifically regarding respondent's answer of "no" to the question of whether he was taping the meeting, the panel unanimously concluded that respondent was "justified" in giving the answer he did. As a further aspect of that issue—whether the answer of "no," even if justified, was an ethical violation—two members of the panel concluded that "the surreptitious taping was not, per se, unauthorized," and since no harm resulted from respondent's misrepresentation, there was insufficient evidence that respondent violated DR 1–102(A)(4). The majority of the panel recommended to the board that the charge be dismissed. The third panel member disagreed, determining that respondent had violated DR 1–102(A)(4) and recommending a public reprimand.

{¶ 16} The board concluded that a violation of DR 1–102(A)(4) had occurred, found that the harm done by the dishonesty "was minimal," and further "found significant mitigating evidence putting this violation in context," referring to the previous disciplinary investigation of respondent in the 1980s and the serious head injury suffered by responded prior to the videotaped meeting. As to its recommendation to this court, the board fully adopted the panel's findings of fact,

recommended that respondent be publicly reprimanded based on its conclusion that respondent had violated DR 1–102(A)(4), and recommended that costs be taxed to respondent.

## II

### Analysis

{¶ 17} As mentioned above, the board's Opinion No. 97–3 provided much of the framework within which the panel and board considered this case. In that advisory opinion, the board recognized that it is generally not illegal for a party who is not a law enforcement officer to make a surreptitious recording. See R.C. 2933.52(B); Section 2511(2)(d), Title 18, U.S.Code. Even though it may be legal to make such a recording, that does not settle the issue of whether it is ethical for an attorney in performing his or her legal duties to make a surreptitious recording.

{¶ 18} After weighing the approaches of the American Bar Association Committee on Ethics and Professional Responsibility and various jurisdictions, the board opinion concluded that, under routine circumstances, surreptitious taping by attorneys in legal representations is unethical, primarily based on the legal profession's duty of candor. However, the board opinion recognized exceptions to this general rule. The syllabus of Opinion No. 97–3 reads:

{¶ 19} "An attorney in the course of legal representation should not make surreptitious recordings of his or her conversations with clients, witnesses, opposing parties, opposing counsel, or others without their notification or consent. The act of surreptitious recording by attorneys may violate DR 1–102(A)(4) unless the act when considered in the context of the circumstances does not rise to the level of dishonesty, fraud, deceit, or misrepresentation. The burden would be upon each individual attorney to justify on a case by case basis why the facts and circumstances surrounding the surreptitious recording did not violate DR 1–102(A)(4). Recognized exceptions to the prohibition on surreptitious recording include prosecuting and law enforcement attorney exception; criminal defense attorney exception; and extraordinary circumstances exception."

{¶ 20} Respondent invites this court to find, as the majority of the panel did, that at least one of the exceptions mentioned within Opinion No. 97–3 applies to respondent's situation to lead to an ultimate conclusion that no violation of DR 1–102(A)(4) occurred. Respondent recognizes that this advisory opinion is not binding on this court and further invites us to find that the exceptions discussed in the opinion are "too narrow" and that the opinion improperly places on the surreptitious recorder invoking an exception the burden of justifying his or her actions, when it would be more appropriate to presume legitimacy when an

exception is invoked. Furthermore, respondent urges that due process and fundamental fairness militate against finding a violation in these circumstances.

{¶ 21} We have no difficulty accepting many of the general sentiments expressed in the advisory opinion. For example, we fully agree with the proposition that attorneys generally should not employ surreptitious taping in the course of their legal representation. However, we have considerable misgivings about using this case to adopt definitive principles, with exceptions and rules of burden of proof, relative to surreptitious taping.

{¶ 22} The considerations underlying the exceptions for prosecuting attorneys and law enforcement attorneys are largely based on permitting a degree of freedom of action to a government attorney who is conducting a criminal investigation. In this case, respondent taped ODC investigators who were themselves investigating him. If we were to give unconditional approval to respondent's actions in this situation, we could be opening the door to parties advocating unwarranted and possibly even ludicrous extensions of our reasoning to other situations.

{¶ 23} In a similar way, we see significant problems with applying the extraordinary-circumstances exception to this scenario, particularly when we consider respondent's answer of "no" when asked whether he was taping the meeting. Even assuming that the circumstances in this case might be "extraordinary," which they most certainly are in several ways, there is still the question of why respondent could not simply have acknowledged that he was making the tape when asked, rather than denying it.

{¶ 24} Were it not for additional extenuating circumstances, we would be inclined to find that respondent violated DR 1–102(A)(4), perhaps by finding Opinion No. 97–3 inapplicable, or perhaps by adopting it but finding that respondent has not met his burden of proving that its exceptions apply. In any event, based on the totality of the circumstances, we decline to focus on that opinion as a definitive guide for resolution of this particular case.

{¶ 25} We recognize that reasonable minds can differ in how this case is viewed and that, on a fundamental level, there is understandable apprehension about allowing respondent to escape discipline for what can only be characterized as lying to ODC investigators. We are not totally comfortable with establishing a precedent that seems to accept that telling such a lie is tolerable. Nevertheless, after thoroughly considering the salient details, we find that dismissal of the charge is warranted. We caution explicitly that our determination is based on the unique circumstances of this case and is limited exclusively to this situation.

{¶ 26} To reach our conclusion, we have examined in detail the extenuating factors that caused the CBA Grievance Committee and the majority of the panel to find that respondent did not violate DR 1–102(A)(4). Three of the most

significant factors are respondent's investigations of the Smiths, the prior disciplinary proceeding involving respondent in the 1980s, and respondent's head injury.

{¶ 27} We agree with the panel that the record clearly supports a determination that respondent was involved in multiple credible investigations of the Smiths. The record establishes in depth the details of the most significant investigations: the unexplained whiting out from the county auditor's 1996 tax duplicate of liens against the former Satralloy property that amounted to about $1 million, including penalties and interest, at the time of the disciplinary hearing; the possible theft of water by the Smiths from the village of Wintersville; and the separate investigations by the Ohio and United States EPAs into the former Satralloy property.

{¶ 28} In addition, the record supports the conclusion that the Smiths were attempting to use the grievance against respondent, and ODC's investigation of it, to curtail respondent's prosecutorial investigations into their activities. The testimony of a Harrison County common pleas judge who described a 2000 conversation with Mr. Smith in which Mr. Smith inquired whether he knew of any "dirt" that could be used against respondent was especially probative of this point. Several witnesses testified that the Smiths were strong supporters of respondent's opponent for county prosecutor in the November 2000 election, indicating that the Smiths wished for respondent to be defeated for office. It is not a great leap of logic to conclude that the Smiths wished to stop his investigations of them, suggesting that the grievance against respondent was filed as an alternative method of pursuing the same end. Respondent's former Chief of the Criminal Division testified that in his opinion, the Smith grievance was "completely politically motivated" and that ODC "was doing Gary Smith's bidding for him, either wittingly or unwittingly."

{¶ 29} It appears that respondent understandably viewed the entire ODC investigation as a politically motivated witch-hunt orchestrated by the Smiths, designed to further discredit the investigations against them and to get him out of office and replaced by his opponent and thereby to end the inquiries into their questionable practices. Respondent testified that the Smiths were trying to use every method they could to stop the investigations, that he believed that the ODC investigation of the grievance fit within that pattern, and that the entire scenario was too pat to be a coincidence.

{¶ 30} In addition to supporting the conclusion that the Smiths were trying to manipulate ODC, the record further contains evidence explaining respondent's belief, based on his past experiences, that ODC was susceptible to manipulation. Respondent testified to the panel regarding a disciplinary investigation of his activities conducted by ODC in the 1980s, which was later determined to be

unjustified and politically motivated. Respondent related that that investigation of him was conducted to discredit his legitimate complaints regarding the improper actions of an assigned common pleas visiting judge who was running for associate justice of the Supreme Court of Ohio. It later became clear to respondent that the disciplinary investigation was pursued to bolster the candidacy of that judge, who was a friend of, and was supported by, the then chief justice of the Supreme Court, who had appointed the visiting judge to increase his visibility to voters. Exhibits in the record, including newspaper articles, support the view of these events put forth by respondent.

{¶ 31} As to the effect that previous encounter with a former disciplinary counsel had on him, respondent explained how he was so dismayed by the entire affair that he ran for chief justice in the 1986 Democratic primary, opposing the then chief justice, even though he realized he had no expectation of winning, in order to expose the reprehensible way he had been treated. According to respondent, he received the endorsements of many major newspapers and felt that he had accomplished his purpose of publicizing what he considered to be deplorable conduct. Furthermore, the attorney and judge disciplinary system in Ohio was reformed shortly after that time, and the record supports respondent's belief that he, through his candidacy and other actions, played a significant role in bringing those reforms about. In light of all the above, we agree with the observation of the panel that ample evidence supports the conclusion that ODC "abused its authority" in the prior investigation.

{¶ 32} Respondent's head injury also plays a fundamental role in our consideration. Numerous witnesses in addition to respondent testified that after suffering that injury, he was not the same as before, experiencing memory lapses and episodes of rambling speech, and that he was, in the words of one witness, a "different person" after the accident. The medical reports in the record support the assertions that the head injury was severe and had profound effects. There is no way of knowing how much the head injury influenced the events that occurred, but our full review of the record convinces us that its effect was significant.

{¶ 33} In light of all the above factors, we conclude that respondent's suspicion of ODC was understandable and that his actions regarding the taping were understandable given the totality of the circumstances. Like the board, we fully accept the findings of fact unanimously made by the panel. We have closely reviewed the correspondence in the record that was exchanged between respondent and ODC and its investigators leading up to the meeting, while considering respondent's version of the events, and conclude that respondent's belief that he was being set up by the Smiths was reasonable.

{¶ 34} At the same time, even if we surmise from the record that the ODC investigation of respondent over the Smith grievance seems to have gone afield of what it should have been, we have seen no evidence that ODC or the investigators were intentionally out to get respondent, as happened in the ODC investigation of him in the 1980s. For that reason, we stop short of finding that respondent was fully justified in what he did, particularly in answering "no" when asked whether the taping was occurring. Nevertheless, given all the circumstances, we, like the majority of the panel below and the CBA Grievance Committee, determine that relator has not succeeded in proving a violation of DR 1–102(A)(4).

{¶ 35} The charge is based on an isolated incident. Respondent has a clean disciplinary record except for the investigation of him that occurred in the 1980s that should not have been initiated. Respondent was Jefferson County Prosecutor for 20 years, and there is nothing in the record to indicate that his service was anything other than exemplary during that period. The disciplinary grievance filed against respondent by the Smiths was found soon after the meeting in question to be without substance and was dismissed. Therefore, there is no connection between this charge and any other possible wrongdoing by respondent. The taping and answer of "no" in and of themselves are the entire basis for the charge against respondent.

{¶ 36} No harm resulted from the taping, and respondent did not use the tape for any nefarious purpose. In fact, he did not use the tape at all. If the tape had been important to him, and if it was incriminating, it seems surprising that respondent would not have taken it with him when he vacated his office. The circumstances of the tape's discovery by his successor call into question respondent's motivation to make it in the first place. Respondent did not save the tape or mark it when it was made and did not follow his normal office procedures in handling it.

{¶ 37} The unquantifiable nature of the head injury's effects on respondent's behavior further raises doubts about his answer of "no" when he was asked whether the meeting was being taped. Respondent's head injury is the wild card that prevents us from reaching many firm certainties about what occurred and that leaves room for doubt about virtually every detail of this case. Perhaps he truly in his own mind did not believe he was making the tape, even though he had just moments before activated the taping mechanism. Perhaps he answered no to the question when he meant yes, due to the injury's effects on his thought and speech. The record invites speculation but provides few answers. Although respondent seemingly could have relied on his head injury to argue that he did not knowingly violate DR 1–102(A)(4), he has instead relied on an argument that

he was justified in making the tape and in answering "no," perhaps because he himself obviously cannot fully explain what happened. .

{¶ 38} The board viewed many of the details of this case as mitigating *after* it had found that a violation occurred, but we view those details and others as sufficiently coloring our overall inquiry to lead us to conclude that relator did not prove that respondent violated DR 1–102(A)(4). There is too much uncertainty over too many of the key details to allow us to find a violation.

{¶ 39} In summary, a complete review of the full record before us leads us to conclude that the charge against respondent should be dismissed. We also do not accept the board's recommendation that costs should be taxed against respondent. In light of our decision, respondent's arguments regarding several alleged procedural irregularities in the way this case has progressed against him are moot and will not be considered.[2]

Judgment accordingly.

PFEIFER, LUNDBERG STRATTON and O'DONNELL, JJ., concur.

MOYER, C.J., F.E. SWEENEY and O'CONNOR, JJ., dissent.

------

**MOYER, C.J., dissenting.**

{¶ 40} I respectfully dissent from the majority decision, which dismisses the complaint against respondent. Neither the panel nor the board concluded that the Office of Disciplinary Counsel was a participant in the allegedly politically motivated complaint filed by the Smiths against respondent. We should presume that the Office of Disciplinary Counsel and our peer review process are able to separate their findings and recommendation from the motivations of a complaining party.

{¶ 41} As the majority opinion observes, "there is understandable apprehension about allowing respondent to escape discipline for what can only be characterized as lying to ODC [Office of Disciplinary Counsel] investigators." We should be concerned that we have set a precedent that says that if a lawyer believes a complaint has been filed against him or her for politically motivated reasons, the lawyer is justified in expressly misrepresenting an important fact to those we

------

2. On January 28, 2004, after the board had filed its certified report with this court, respondent filed a request that this court order relator to pay expenses and attorney fees, which respondent alleged were "incurred as a result of Relator's failure to admit Respondent's Request for Admissions," pursuant to Civ.R. 37(C). Relator responded, opposing the request. We strike the request as untimely, finding that it should have been raised before the panel for its consideration and not directed to this court in the first instance.

have entrusted to investigate the complaint. Such situational ethics have no place in a lawyer discipline system.

{¶ 42} I would adopt the recommendation of the Board of Commissioners on Grievances and Discipline and publicly reprimand respondent.

F.E. SWEENEY and O'CONNOR, JJ., concur in the foregoing dissenting opinion.

---

Mitchell, Allen, Catalano & Boda Co., L.P.A., and William Mann; Buckingham, Doolittle & Burroughs, L.L.P., and Bret A. Adams; and Eugene P. Whetzel, for relator.

Kravitz & Kravitz, L.L.C., Max Kravitz, Janet Kravitz and Paula Brown, for respondent.

William F. Schenck, Greene County Prosecuting Attorney, and Andrew J. Hunt, Assistant Prosecuting Attorney, in support of respondent for amicus curiae Ohio Prosecuting Attorneys Association.